**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**JAMES CROSS,**

      **Plaintiff,**

**vs.**                        **Case No. 4:06cv460-RH/WCS**

**WALTER A. McNEIL,**

      **Defendants.**

_____/


**SECOND REPORT AND RECOMMENDATION**

      This is an amended petition for writ of habeas corpus filed by James Cross

pursuant to 28 U.S.C. § 2254, bringing four claims of ineffective assistance of counsel.

Doc. 15.  Petitioner challenges his convictions for burglary of an occupied dwelling,

attempted sexual battery, battery, and resisting an officer without violence.  Petitioner

was convicted and sentenced in the Circuit Court of the Second Judicial Circuit, in and

for Leon County, Florida, case number 02-CF-3364.  Respondent's motion to dismiss,

doc. 20, was denied, the court finding that the petition was timely filed.  Doc. 34

(adopting doc. 33).  Respondent filed a response on the merits.  Doc. 36.  Petitioner has

filed a traverse.  Doc. 38.  Respondent addresses the merits of the of the first three claims and argues failure to exhaust state court remedies as to ground four.

**State Procedural History**

Petitioner was found guilty after a jury trial.  He was designated a prison releasee reoffender as to count 1, burglary of an occupied dwelling, and sentenced to life in prison.  He was sentenced to 5 years for attempted sexual battery, and 1 year on each of the other offenses, all to be served concurrently.

Petitioner timely appealed and his convictions were affirmed.  He filed a Rule 3.850 motion, alleging three claims of ineffective assistance of counsel, the same claims raised here as grounds one, two, and three.  The motion was denied without an evidentiary hearing and that judgment was affirmed on appeal.

**Section 2254 Standard of Review**

"Federal habeas relief is available to state prisoners only after they have exhausted their claims in state court.  28 U.S.C. §§ 2254(b)(1), (c)."  O'Sullivan v. Boerckel, 526 U.S. 838, 839, 119 S.Ct. 1728, 1730, 144 L.Ed.2d 1 (1999).  To properly exhaust remedies as required by § 2254(b), "the federal claim must be fairly presented to the state courts."  Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971), Duncan v. Henry, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (*citing* Picard).  If a claim was not fairly presented but is procedurally barred from further state court review, Petitioner must demonstrate cause for the default and actual prejudice, *or* demonstrate that the constitutional violation has probably resulted in conviction of an innocent person.  Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct.

2565, 115 L.Ed.2d 640 (1991); McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct.

1454, 1470-71, 113 L.Ed.2d 517 (1991).

For claims that were properly exhausted and adjudicated in state court, this

court's review is limited.  "[A] determination of a factual issue made by a State court

shall be presumed to be correct," and Petitioner has "the burden of rebutting the

presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1);

Bui v. Haley, 321 F.3d 1304, 1322 (11th Cir. 2003) (citing the statute, footnote omitted).

A petitioner is entitled to federal habeas relief as to legal findings only if the state court's

adjudication of the merits of the federal claim "resulted in a decision that was contrary

to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States."  § 2254(d)(1).

The law governing ineffective assistance of counsel claims was clearly

established in Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066,

2068, 80 L.Ed.2d 674 (1984).  Williams, 529 U.S. at 405-406, 120 S.Ct. at 1519-1520;

Bell, 535 U.S. at 694-695, 122 S.Ct. at 1850.  Under the two part test of Strickland,

Petitioner must demonstrate both deficient performance and prejudice to the outcome.

To establish deficient performance, a petitioner "must identify the acts or

omissions of counsel that are alleged not to have been the result of reasonable

professional judgment."  Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.  In reviewing

the claim, "counsel is strongly presumed to have rendered adequate assistance and

made all significant decisions in the exercise of reasonable professional judgment."  466

U.S. at 690, 104 S.Ct. at 2066.  "[B]ecause counsel's conduct is presumed reasonable,

for a petitioner to show that the conduct was unreasonable, a petitioner must establish

that no competent counsel would have taken the action that his counsel did take."

Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc), *cert. denied,*

531 U.S. 1204 (2001).

For prejudice, Petitioner must show "a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different.

A reasonable probability is a probability sufficient to undermine confidence in the

outcome."  Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.

**Ground One**

Petitioner asserts that his trial counsel was ineffective for failure to call Dr. Rene

Herrera as a witness at the hearing on the motion in limine to exclude DNA evidence.

*Id.*, p. 4-4.a.; pp. 4-5 on the electronic docket (ECF).  Organic material was found under

Petitioner's fingernails.  The victim had deep scratches on the back of his neck.  The

State planned to call an expert to testify that the victim "could not be excluded" as a

possible donor of the DNA obtained from beneath Petitioner's fingernails.  Petitioner

argues here, as he did before the state court, that this testimony could have been

misunderstood by the jury as saying that the victim was *included* as a source, a

misleading inference that should have resulted in exclusion of the evidence.  Petitioner

argues that had Dr. Herrera been called as a witness at the pretrial hearing, the court

would have excluded the State's DNA opinion evidence entirely.

This claim was presented in Petitioner's Rule 3.850 motion.  The state court

denied the claim, reasoning that Petitioner's counsel "argued very skillfully and at length

in favor of the exclusion of the evidence."  Ex. H, R. 126.  The court noted that counsel

had just taken Dr. Herrera's deposition by telephone, and had "fresh knowledge of the

expert's opinions and was able to eloquently relay all pertinent information."  *Id.*, R. 126-127.  The court concluded that there was "no reasonable likelihood that the presence of the defense expert at the hearing would have changed the ultimate ruling."  *Id.*, R. 127.

Prejudice to the outcome in this context, however, is not just that the ruling on the motion in limine would have been different had Dr. Herrera testified, but requires a showing that undermines this court's confidence in the ultimate outcome at trial had the DNA evidence been excluded.  Further, if there were evidence presented to the Rule 3.850 court that Dr. Herrera might have presented testimony that was not put before the court at the hearing on the motion in limine, then the court's reasoning, that Petitioner's counsel "eloquently relay[ed] all pertinent information," would be flawed.

But Petitioner did not show these things in the prosecution of his Rule 3.850 motion, and he has not shown these things before this court.  The only evidence as to what Dr. Herrera might have said at the motion in limine hearing is what she said at trial. From this it is plain that even if called as a witness at the hearing on the motion in limine, Dr. Herrera would not have testified that the State's DNA evidence should have been excluded because not scientifically reliable.  The only detail that might have provided a <u>Frye</u>[1] challenge was the fact that the Florida Department of Law Enforcement laboratory, through validation studies, had established a cut-off point of 120 for the reliability of an allele[2] score.  Dr. Herrera testified that the cut-off scores are

---

[1] Florida still follows the rules established in <u>Frye v. United States</u>, 293 F. 1013 (D.C. Cir.1923) for expert testimony.  <u>State v. Contreras</u>, 979 So. 2d 896, 910 n.6 (Fla. 2008), citing FLA. R. CRIM. P. 3.220(b)(1)(A)(i).

[2] An allele is any of the alternative forms of a gene that may occur at a given locus.  MERRIAM-WEBSTER ONLINE, found at: http://www.merriam-webster.com/dictionary

validated by each laboratory, but she did not question the choice of 120 as a cut-off

score, or, more importantly, the methods used by the Florida Department of Law

Enforcement to establish that threshold.

This left for consideration only the question of whether prejudice from the State's

evidence outweighed the probative value.  *See* FLA. STAT. § 90.403.  On that score, Dr.

Herrera's trial testimony added nothing to the proffer by Petitioner's counsel at the

hearing on the motion in limine, just as the trial court found in denying the Rule 3.850

motion.  Consequently, the failure to call Dr. Herrera as a witness at the motion in limine

hearing was neither attorney error nor prejudice to the outcome.

These conclusions, however, have been reached only after a thorough study of

the record.  The discussion which follows is intended to explain how these conclusions

were reached.

Counsel for Petitioner filed a motion in limine prior to trial.  Doc. 36, Ex. N.  A

hearing was held on the motion on August 5, 2003.  Ex. O.  At the hearing, Petitioner's

attorney said he had deposed Dr. Herrera the day before.  Ex. O, p. 8.  He explained

that marker D8S1179 was used as the genetic marker for comparison of the sample

taken from the victim and the sample taken from under Petitioner's fingernails.  *Id.*, p. 5.

The DNA tests revealed 4 alleles present.  *Id.*, p. 6.  Of those 4, 1 was validly and

consistent with the victim's DNA.  *Id.*  Counsel said that this was not enough because

that single allele might be shared with a large population of people.  *Id.*, p. 7.  Counsel

said that since this "doesn't even meet FDLE standards for a match, there's not even

any population frequency projection that has been made in this case."  *Id.*  Counsel

represented that Dr. Herrera said that use of the 1 allele to say that the victim could not

be excluded as a donor was as helpful as describing a person suspected of having committed an offense as a person with two arms.  *Id.*, p. 9.

Counsel for the State argued in response that if there had been a mixture of blood by types, and if the suspect's blood type had been the same as one of the types in the mixture, then the most that one might say is that the suspect could not be excluded as a possible donor to the mixture.  *Id.*, p. 10.  Counsel argued that the DNA evidence he intended to offer in Petitioner's trial was of the same caliber as blood type evidence, which has a long history of acceptance in trials.  *Id.*  Counsel argued that the evidence he intended to offer was simply that the DNA evidence was not exculpatory. *Id.*, p. 11.  He characterized this as "one small piece of the puzzle that goes to support the victim's statement."  *Id.*  He emphasized that the victim had identified Petitioner as the assailant and Petitioner had been caught in the area shortly after the crime occurred.  *Id.*

Karen Barnes, the State's expert at that time, was then called as a witness.  *Id.*, p. 13.  She explained that 9 markers or alleles were tested.[3]  *Id.*, p. 18.  She said that the results indicated a mixture of DNA.  *Id.*  This was so because it the material had contained only a single source of the DNA, you would expect only one or two peaks at the marker since everyone receives either one or two kinds of genetic information from parents.[4]  *Id.*  Three "callable" peaks were detected here, indicating a DNA mixture from

_____

[3] Usually 13 markers are tested, but this sample was only sufficient for testing 9 markers.  *Id.*, p. 31.

[4] The possibilities are that the two parents give a child the same DNA, in which case only one peak would be present, or two types, in which case two types would be present.

at least two people.  *Id.*, pp. 18-19.  The victim's DNA was not a major donor of the

mixture.[5]  *Id.*, p. 19.  There was also a fourth detectable peak, but this, said Barnes, was

"below our calling criteria."  *Id.*, p. 20.  Since one peak was "callable" and matched the

victim, and the other peak was not sufficient to make a call at all, Ms. Barnes said that

"this person is not excluded as a donor.  We can't say it matches, because one doesn't

meet our calling criteria.  If it had excluded the victim, then we would have said it's an

exclusion."  *Id.*, pp. 22-23.

Ms. Barnes said that it was "possible to give you an estimate of how frequent that

one allele would be in the population," and she said she had "it generated here."  *Id.*, p.

27.  "Now, that frequency would represent anyone who has a 12 [allele] in their

genotype."  *Id.*, p. 37.  Ms. Barnes said that allele 12 would be expected to be a part of

the profile of 14% of the Caucasian population, 10% of the African-American population,

and 10% of the Hispanic population.  *Id.*, pp. 39-40.  The Florida Department of

Corrections offender website reports that Petitioner is an African-American.[6]

Ms. Barnes explained that the "noncallable" marker, allele 15, was not relied

upon because its RFU score[7] was 93, and that score had to exceed 120 according to

her laboratory standards (the Florida Department of Law Enforcement) to be relied

---

[5] The concept of a "major donor" was not explained, but it probably has to do with the fact that the quantity of the DNA allele detected that was consistent with Petitioner's DNA had an RFU score (see *infra*, note 7) that was only slightly above the threshold quantity for validity, thus making it a "minor donor" to the mixture.

[6] The website is found at:  at http://www.dc.state.fl.us/ActiveInmates/search.asp

[7] As will be explained ahead from the testimony of Dr. Herrera at trial, the RFU score is the result of detection of the fluorescence of the DNA material in an electropherogram, with a higher score indicating more mass available.  The more mass, the higher the reliability of the DNA allele indicator.

upon.  *Id.*, p. 41.  She said that had the threshold for reliability been set at 75, allele 15

would have been counted.  *Id.*, p. 42.  Allele 15 was consistent with the victim's DNA in

this case.  *Id.*  As a consequence, had allele 15 been counted, then alleles 12 and 15

would have been consistent with the victim's DNA and that would have been deemed to

have been a "match" rather than merely a "cannot exclude."  *Id.*  The statistic

associated with that match is 1 out of 31 Caucasians, 1 out of 22 African-Americans,

and 1 out of 39 in the Hispanic population.  *Id.*

    The court then asked the lawyers whether the admissibility of Dr. Barnes's

testimony turned upon whether the probative value of the evidence was outweighed by

prejudice.  *Id.*, p. 44.  Petitioner's attorney disagreed, and said that the court first

needed to determine whether the evidence was scientifically reliable.[8]  *Id.*  He pointed

out that the experts begin with 13 markers, but in this case, ended up with only one that

was sufficiently reliable.  *Id.*, pp. 44-45.  He pointed out that the RFU value for allele 12

was only 135, and some laboratories establish a threshold for reliability at 150 or 200,

rather than 120 as here.  *Id.*, p. 45.  From this, counsel argued that the probative value

was outweighed by prejudice (which was not a <u>Frye</u> claim).  *Id.*, p. 46.

    The trial court denied the motion in limine.  Ex. P.  The court reasoned that

Petitioner's argument went only to the weight of the evidence, and that was for the jury

to decide.  *Id.*  Since the evidence was relevant, it was to be admitted.  *Id.*

    At trial, the State called Deane Johnson as its DNA expert.  Ex. M (trial

transcript), p. 175.  She testified the same as Ms. Barnes, that she could not

---

    [8] This was the only apparent attempt to argue a <u>Frye</u> issue, but as explained
ahead, then and now there is no evidence to support a <u>Frye</u> challenge to the DNA
testing in this case.

conclusively say that the DNA material under Petitioner's fingernails came from the victim because one of the two numbers "does not meet the threshold for interpretation in my crime laboratory," but she could say from the one number that "it's possible" that the victim was the source.  *Id.*, p. 183.  At trial, Ms. Johnson did not provide evidence of the statistical distribution of this single allele in the population.

Dr. Rene Herrera testified for Petitioner at trial.  Ex. M, p. 236.  Dr. Herrera first explained how the DNA is separated and then replicated into millions of copies, enough for analysis.  *Id.*, pp. 246-248.  She explained that of the two types of validation studies, one is "in situ," entirely laboratory-specific, and "cannot be transplanted from one lab to the other."  *Id.*, p. 249.  She explained that each laboratory has variables that each laboratory had to account for itself.  *Id.*, p. 250.  In situ validation studies by each specific laboratory are required by the scientific community for acceptance of the conclusions to be drawn.  *Id.*  Dr. Herrera did *not* testify that the validation studies of the Florida Department of Law Enforcement laboratory were invalid.

Dr. Herrera said that after the DNA is amplified (copied), it is placed into an electropherogram.  *Id.*  The DNA is passed into a glass capillary and an electric current is applied.  *Id.*, p. 251.  Fluorochrome is added and when a UV light is shined on the capillary, the strands fluoresce.  *Id.*, pp. 251-252.  The instrument thereby can detect the differing sizes of the molecules as they migrate through the capillary under the influence of the electric current since molecules of differing mass migrate at differing rates.  *Id.*  Peaks are detected on a chart corresponding to the sizes of the molecules.  *Id.*, p. 252.  The peaks are the "markers" for each site or allele, e.g., 12 or 15 as relevant in this case.  *Id.*, pp. 252-253.  However, said Dr. Herrera, false signals may be

produced from dirt in the capillary, fluctuations in voltage, and other sources.  *Id.*, p. 253.  Dr. Herrera said that each laboratory has to establish thresholds of reliability to account for these residual false signals, and these are "very lab-specific."  *Id.*, p. 254.  She said that it "would be defeating the purpose of all that [validation testing] if, after doing the validations and you ascertain or you determine that a certain level of signal should not be trusted, to turn around and trust it."[9]  *Id.*, p. 264.

Dr. Herrera was then shown the results in this case.  Allele 11 had the number 1328 assigned; allele 14 had 1025 assigned; allele 12 had 135 assigned; and allele 15 had 93 assigned.  *Id.*, p. 259.  She said that the numbers assigned reflected the amount of material available because "[t]he fluorescence emitted by the fluorochrome in the fragments is always proportional to the mass or the amount."  *Id.*  She explained that the victim had alleles 12 and 15.  *Id.*, p. 266.  If the 12 in the sample under the fingernails was the only reliable allele, it could have been deposited there by a person who was homozygous, that is, who had the pattern 12, 12 alleles, receiving the same allele from both parents.  *Id.*  She also again noted that the 12 allele had an RFU score of 135.  *Id.*, p. 259.  Dr. Herrera said she did not disagree with the statement that the victim could not be excluded as a donor to the DNA sample.  *Id.*, pp. 270-271.

In summary, Dr. Herrera presented no evidence that the Florida Department of Law Enforcement relied upon unreliable scientific principles to establish 120 as the lowest value for a reliable marker determination.  *See, e.g.*, United States v. Mitchell, 502 F.3d 931, 969 (9th Cir. 2007), *cert. denied*, 2008 WL 412650 (June 9, 2008) ("the

---

[9] That did not happen here.  Ms. Johnson relied solely upon allele 12, which was sufficiently robust to be trusted applying the FDLE validation RFU threshold of 120.

real difficulty with the DNA evidence in this case lay with the coherence of the expert's explanation of what constituted a 'match,' an 'exclusion,' and a 'cannot exclude' – not with the inherent integrity of the methodology or results.").  Dr. Herrera's only challenge to the State's reliance upon allele 12 was that the evidence had little probative value, and arguably was prejudicial since juries can easily misunderstand DNA evidence.

        The federal cases that have dealt with the admissibility of DNA evidence having a low statistical value are few and reach differing results.  United States v. Mitchell held that it was not plain error for the jury to have been told that the defendant "could not be excluded" as a DNA donor because "some" consistent alleles found on a mask, and six alleles taken from a glove, were consistent with his DNA.  502 F.3d at 970.  The court said that the jury understood that this evidence only "somewhat" linked the Defendant to the mask and glove.  The Mitchell case was not, however, a case involving a single consistent allele.

        In United States v. Graves, 465 F.Supp.2d 450 (E.D. Pa. 2006), the defendant was charged with bank robbery.  DNA evidence from an umbrella and a pair of shoes was to be offered to establish that defendant had committed the offense.  465 F.Supp.2d at 452.  The probability of selecting an unrelated person as the potential contributor to the DNA found in the shoes was 1 in 2,900 African Americans for the left shoe and 1 in 3,600 African Americans for the right.  Id., at 454.  The court concluded that the shoe DNA evidence would be admissible.  Id., at 459.  The DNA evidence from the umbrella, however, was excluded because 50% of the relevant population could not be excluded.  Id.

In <u>United States v. Morrow</u>, 374 F.Supp.2d 51 (D. D.C. 2005), the court discussed at length the issue of the admissibility of DNA evidence with a low statistical significance. 374 F.Supp.2d at 63-66. Again, the DNA evidence was to be used to establish the identity of the person who committed the offense, a series of armed robberies. The DNA evidence had a "relatively low level of statistical significance, ranging from a 1:12 probability of selecting an unrelated individual in the relevant population to a 1:1 probability of selecting an unrelated individual." *Id.*, at 62. After a lengthy discussion, the court concluded that a jury would understand the low significance and would not be misled, and the evidence admittedly had some probative value. *Id.*, at 65.

These cases are discussed only to show that courts reach differing results when confronted with DNA evidence of low statistical value. The issue here, however, is not what a federal court might have done about the admissibility of this sort of evidence, but whether Petitioner's attorney could have reached a different trial outcome in the state court had he called Dr. Herrera as a witness at the motion in limine hearing. The answer is no for the reasons discussed above. All of the arguments that Dr. Herrera presented at trial were presented by proffer to the state court at the hearing on the motion in limine. It was not attorney error to fail to call Dr. Herrera as a witness.

The trial court's ruling is sensible. While DNA evidence is a bit complicated, a jury would not have been misled any more than had it been presented with blood type evidence. The State was entitled to relate to the jury that it had tried to perform all of the DNA tests that it could, and that because the material taken from under Petitioner's fingernails was so small in mass, the most that could be said was that the DNA test did

not totally exonerate (exclude) Petitioner.  Therefore, the state court's adjudication of the merits of this federal claim has not "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

**Ground Two**

Petitioner contends his attorney was ineffective for failing to call "alibi" witnesses. Doc. 15, p. 4.  Ground two, however, does not apply to an alibi witness as such, but to the testimony of Richard Gillis, the roommate of the victim, Brent Deschaine.  Doc. 15, pp. 4.d. through 4.j.; pp. 9-15 on ECF.  Respondent also addresses this as a claim concerning the failure to call Gillis as a witness, and concedes exhaustion of state remedies as to this claim.  Doc. 36, p. 9.

Petitioner's presentation of this claim is supposed to be found on pages 4d-4k of his § 2254 petition.  Doc. 15 (amended petition), p. 4.  Those pages have nothing to do with Gillis.[10]  Petitioner does present allegations related to Gillis in another portion of the petition.  *Id.*, pp. 4h-4j; pp. 13-15 on ECF.  As noted by Respondent, however, the only potential discrepancy that Petitioner has identified is the assertion that Gillis said that he followed the assailant outside the apartment, talked with the intruder, and at that time,

---

[10] Page 4d asserts that Gillis and the victim both gave descriptions of the assailant to the police.  *Id.*, p. 4d; p. 9 on ECF.  The descriptions given as presented by Petitioner are not in conflict.  Hence, it was not error to call Gillis to give this evidence. On page 4e, Petitioner describes the interaction of the police and the place and timing of their arrest of him.  *Id.*, p. 4f; p. 10 on ECF.  None of this concerns prospective testimony from Gillis.  On page 4f, Petitioner presents evidence of the 911 telephone call between the police operator and the victim.  *Id.*, p. 4f; p. 11 on ECF.  He argues that what the victim said on the 911 call conflicted with what the victim said at trial.  *Id.*. None of this relates to prospective testimony of Gillis.  On page 4g, Petitioner presents evidence related to Officer Aaron Scott.  *Id.*, p. 4g; p. 12 on ECF.  This does not relate to testimony that might have been elicited from Gillis.

the victim was "far away across the courtyard."  *Id.*, p. 4i; p. 14 on ECF.  This is alleged

to conflict with the trial testimony of the victim, who said "he looked at the intruder for an

extended period of time outside the courtyard."  *Id.*  He argues that the victim said he

was "running through the courtyard."  *Id.*  Petitioner asserts that when the victim was

asked on the 911 call to relate where the assailant was, the victim said "I don't know."

*Id.*, p. 4j; p. 15 on ECF.  All of this is supposed to show that the victim did not have an

accurate impression of his assailant and thus the identification made by the victim,

when Petitioner was seated in the police car shortly after his arrest, was unreliable.  *Id.*

 Attached to the petition is an "offense reporting form" signed by Richard Gillis.

Doc. 15, Ex. D; p. 20 on ECF.  There Gillis said:

> I woke up to my roommate yelling and some guy hitting him.  They ran
> outside and I went out there.  My roommate was standing far away and
> the guy told me that before the night was over, he was going to kill my
> roommate.  Then he ran away.

> I positively identified the man that the police had in custody.

*Id.*

 In his response, Petitioner elaborates further on this claim.  Doc. 38.  He argues

that the victim did not give a description of his assailant before he was asked to look at

Petitioner seated in the patrol car.  *Id.*, p. 5; p. 8 on ECF.  He argues that Gillis, on the

other hand, gave a description of the assailant on the 911 call, and he gave a

description to the first officer to "arrive on the scene."  *Id.*  He notes that Gillis said the

intruder "was kind of tall and wore a hat," and he said he "got a good look at the intruder

while 'outside when he talked to me.' "  *Id.*, Ex. A; p. 21 on ECF.  He described the

assailant as a "black guy with a hat on and jeans" wearing a T-shirt.  *Id.*; p. 22 on ECF.

Gillis, according to Petitioner, testified in his deposition that when he arrived at the

police car, the person in the back seat was black and had the same kind of clothing on.

*Id.*  Gillis said he was "99.9 percent sure" his identification of Petitioner as the assailant

was correct.  *Id.*, p. 23 on ECF.  Petitioner notes that at trial, the victim said that after he

left the apartment, his assailant chased him, came to about ten feet away, and said to

him: "Just come here, just come here."  *Id.*, p. 24 on ECF.  The discrepancy, asserts

Petitioner, is that while the victim said that his assailant was about ten feet away and

was approaching him, Gillis said that when he talked with the assailant, the victim was

far away in the courtyard.  *Id.*  From this Petitioner argues that Gillis should have been

called to testify.  *Id.*, p. 6; p. 9 on ECF.

  Gillis was not called as a witness by Petitioner's attorney.  Ex. M, R. 224.  The

deposition of Gillis is attached as exhibit B to Petitioner's Rule 3.850 motion.  Ex. H, R.

69-86.  In this deposition, Gillis testified that when he was awakened by the victim's

yelling in his apartment, the intruder was there but it was "really dark, and I guess he

was kind of tall, and he had a hat on."  *Id.*, R. 74.  He could not tell the intruder's race.

*Id.*, R. 76.  Gillis said that he got a good look at the intruder "outside when he talked to

me."  *Id.*, R. 75.  Gillis said that his roommate, the victim, grabbed his cellphone,

headed out of the room, and the intruder chased him.  *Id.*  Gillis followed them out.  *Id.*

When he got outside, the intruder was "kind of far away" from the victim.  *Id.*, R. 77.

The intruder was 5 to 10 feet from Gillis.  *Id.*  He could see that the intruder was a "black

guy with a hat on and jeans," and wore a "baseball cap."  *Id.*  He thought he had a T-

shirt on.  *Id.*, R. 78.  The intruder told Gillis: "you tell that boy before morning, I'm going

to kill him."  *Id.*  The intruder then just ran away, or "kind of walk[ed] away" towards

Bryan Street which gives access to Tennessee Street.  *Id.*  The victim gave Gillis the

cellphone and ran inside to vomit.  *Id.*, R. 79.  The victim was already then on the phone

with the police.  *Id.*  Gillis was taken to a hotel parking lot or apartments to view the

person arrested.  *Id.*, R. 80.  He said that the person was wearing the "same kind of

clothes" and was black, but Gillis did not have his glasses on and he had to view the

man through the plexiglass separating the back and front seats of the patrol car, and the

glass had "tiny cracks in it."  *Id.*, R. 80-81.  Gillis said that his glasses were for distance

vision.  *Id.*, R. 81.  Gillis said that he needed glasses to see clearly, but he could see 10

to 15 feet without glasses.  *Id.*, R. 82.  Gillis was "99.9 percent sure" that he correctly

identified Petitioner as the intruder.  *Id.*, R. 83.

   The trial court denied this claim, finding that Petitioner had gone through the

deposition of Mr. Gillis and tried to find "the slightest discrepancy" between his

testimony and his roommate, Mr. Deschaine.  Ex. H, R. 128.  The court found these

discrepancies to be without "any significance whatsoever."  *Id.*

   Petitioner has not shown that this ruling has "resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly established Federal law,

as determined by the Supreme Court of the United States."  § 2254(d)(1).  Indeed, I can

think of no good that might have come from having Gillis come into court as an eye

witness to identify Petitioner as the victim's assailant.  Gillis said that he got a good look

at the assailant and that he could see effectively at 10 to 15 feet.  The slight

discrepancy as to who was standing where at what time in the tumult following the

sexual assault is of little importance since Gillis would have identified Petitioner.

Ground two affords no relief.

**Ground Three**

Petitioner contends that he was deprived of effective assistance of counsel for failure to call Officer Aaron Scott as a witness.  Doc. 15, p, 5; p. 8 on ECF.  Petitioner relies upon the allegations in pages 4d-4j for this claim, as well as upon attached exhibit B, a drawing of the area of the crime and of the arrest.  *Id.*  The gist of the claim is that had Officer Scott been called as a witness, he would have established that it would have been impossible for Petitioner to have crossed Tennessee Street (a broad, well lighted street) on foot, or to have crossed other nearby open areas, without Scott seeing him.  Since the victim's apartment was on one side of Tennessee Street and Petitioner was arrested on the other side, it is undisputed that if Petitioner were the assailant, he would have had to cross Tennessee Street before his arrest.

Petitioner has not explained who created exhibit B, the map of the crime scene and the arrest location.  There is no evidence that this exhibit was a part of the trial record.  The exhibit was attached to Petitioner's Rule 3.850 as exhibit D.  Ex. H, R. 101. The motion simply asserted that it was an "accurate depiction of the subject areas as testified too [sic]."  *Id.*, R. 51.

The trial court denied this claim in the Rule 3.850 motion, finding that Petitioner's assertion that Officer Scott would have presented significantly different testimony from Officers Furney and Mahoney, who did testify, "is completely wrong."  Ex. H, R. 128-129.  The court relied upon the testimony of Furney and Mahoney.  *Id.*, R. 129, citing trial transcript, pages 52-76 and 125-146.

Attached to the Rule 3.850 motion is the transcript of the deposition of Officer Scott.  Ex. H, exhibit C to the Rule 3.850 motion, R. 88-100.  Scott said that he was on

traffic patrol the night the assault occurred, and he and Officer Furney were at a stationary position at about the 900 block of Tennessee in separate patrol cars. *Id.*, R. 90. Scott apparently said (and this is not clear) that he and Furney went first to the victim's apartment complex, but the assailant had fled. *Id.*, R. 91. They then received a call from Officer Mahoney that Mahoney, who was near 1308 West Brevard Street, had just seen somebody matching the description of the suspect who had "dipped on him" (tried to hide). *Id.* Mahoney had set out on foot to try to locate this person. *Id.* Scott apparently then went to the Days Inn parking lot, which Scott said is basically near Tennessee, Brevard, and Wadsworth Streets. *Id.*, R. 92. Scott heard Mahoney say that the suspect was eastbound on Brevard Street, "running away from me." *Id.* He activated his lights and saw Mahoney chasing a black male along the north side of Brevard Street along the sidewalk. *Id.* At the Plaza Apartments, the suspect turned left into the complex and ran along the west side. *Id.* Scott exited his vehicle and chased the suspect. *Id.*, R. 93. All of the remainder of Scott's testimony concerned the lengthy foot chase until he arrested Petitioner, who was found hiding under a motor vehicle. *Id.*, R. 93-99.

Officer Furney testified at trial that within 2 minutes of receiving the initial call, she was "on the scene" at the victim's apartments. Ex. M, p. 53. Furney said she and Officer Scott were in the parking lot of the Florida State University President's Mansion, in about the 1000 block of Tennessee, "right next to the Burger King." *Id.*, p. 63. This was about three or four blocks from the Royal Oaks Apartment where the assault was committed. *Id.* She said that while she was there, she did not see anyone walking on Tennessee Street. *Id.*, p. 72. After the call came in, she drove to the assault scene

without using her overhead lights.  *Id.*, p. 63  She did not observe anyone on Tennessee or Bryant Streets as she went to the Royal Oaks Apartment, and she then had a description of a black male in a white shirt and blue jeans.  *Id.*, p. 64.  It was 4:30 a.m. and it was not unusual for there to be no one on the street or sidewalks.  *Id.*, pp. 72-73.

When Furney arrived at the scene of the assault, she said that she contacted the victim and his roommate in their apartment.  *Id.*, p. 53.  They were "visibly shaken," and afraid to open the door.  *Id.*  The victim gave her a description of a black male, about six feet tall, with a round nose and a strong smell of alcohol, wearing a white T-shirt and a black baseball cap.  *Id.*, p. 54.  She put out a BOLO.  *Id.*  Furney questioned the victim about what had happened, and then she heard over her radio that Officer Mahoney had just seen a person matching the description she had broadcast over the radio and was chasing him on foot.  *Id.*, pp. 55-56.  She testified that she had not been at the apartment for very long when she heard about the foot chase.  *Id.*, p. 76.

Officer Mahoney testified that he heard the first call at 4:26 a.m., and "took a routine response over there."  *Id.*, p. 125.  This would mean that he began to drive toward the area.  Mahoney said he got an initial description of the suspect in this first call at 4:26 a.m.  *Id.*, p. 126.  Mahoney said that he was west bound on Brevard Street at that time, headed toward Tennessee Street.[11]  *Id.*, pp. 126-127.  He had not seen any foot traffic at all.  *Id.*, p. 127.  Mahoney then received an updated description of the suspect.  *Id.*, p. 127.  This would have occurred as Furney interviewed the victim at the scene.  He spotted Petitioner less than ten minutes after the initial call (4:26 a.m.) had

---

[11] Petitioner's map shows that Brevard Street intersects with Tennessee Street at an angle.  Beyond that on Tennessee Street is a cross street that is Bryan Street to the south.  The victim's apartment was on Bryan Street according to the map.

gone out, and within 30 seconds after Officer Furney had sent out the second description.  *Id.*  He saw a black male in a black ball cap, white T-shirt, and dark pants. *Id.*, p. 128.  There was no one else on the street.  *Id.*  Mahoney said that the person was walking eastbound on Brevard at the Ramada Inn and seemed to be turning into the parking lot there.  *Id.*  Mahone averted his gaze for a second and said, "when he saw me," the person was gone.  *Id.* and p. 129.  The person he had seen was three blocks from the crime scene and fit the description he had heard over the radio.  *Id.*, p. 129. Mahoney stopped his car, jumped out, and began looking for the person.  *Id.*  Mahoney then heard a loud crashing in bushes behind the motel, saw the black male with the black ball cap, white T-shirt, and dark pants; Mahoney identified himself as a police officer and shouted for the person to stop.  *Id.*, pp. 130-131.  Officer Mahoney said: "when he sees me, he's gone, running, which is, you know, enough reasonable suspicion for me to find out what's going on to detain him."  *Id.*, p. 131.

In summary, Petitioner's counsel covered some of the same points that he would have covered with Officer Cross in his cross examination of Officer Furney.  She was in the same location initially as Scott, when Petitioner would have been trying to cross Tennessee Street, and she drove immediately along the same route on Tennessee Street to Bryan Street as Scott to the crime scene and saw no one on the street or the sidewalk.  Petitioner's counsel did not need to call Scott to establish this.

Moreover, there is nothing in Scott's testimony to suggest that he should have seen Petitioner after he (Scott) got to the Days Inn parking lot.  Petitioner has not come forward with anything further that Scott might have said.  That Scott did not see Petitioner crossing Tennessee was of little value to Petitioner.  There is evidence that

Petitioner tried to hide numerous times after the officers tried to stop him, and this gives rise to a reasonable inference that he had tried to evade detection before then, when he knew that the victim had called the police on his cellphone.

Further, Officer Scott would have provided more damaging evidence.  He would have testified that he had to chase Petitioner through parking lots and around buildings for a significant period of time before he caught him.  His testimony would have been more detailed than Officer Mahoney's description of the chase.  Ex. M, pp. 132-133 (Mahoney's testimony briefly describing the chase).  There was no useful advantage for Petitioner's counsel to call Scott to give more detailed emphasis about flight to avoid arrest so soon after the offense.  Therefore, Petitioner has not shown that this ruling has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).  Ground three is without merit.

**Ground Four**

Petitioner faults his attorney for failing to place the audio recording of the 911 call into evidence.  Doc. 15, p. 5; p. 8 on ECF.  Respondent argues that Petitioner failed to present this precise claim to the state court in his Rule 3.850 motion.  Doc. 36, p. 15.

Petitioner presented three grounds for relief in his Rule 3.850 motion.  Ex. H, R. 41, 45, and 49.  This is not one of them.  Petitioner has not shown cause for his procedural default, or prejudice to the outcome.  This court, therefore, should not reach the merits of ground four.

**Conclusion**

Accordingly, it is **RECOMMENDED** that 28 U.S.C. § 2254 petition for writ of habeas corpus filed by James Cross challenging his convictions in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, case number 02-CF-3364, for burglary of an occupied dwelling, attempted sexual battery, battery, and resisting an officer without violence be **DENIED WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on June 19, 2008.


_s/    William C. Sherrill, Jr._____
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**